## C. M. STEWART ET AL. v. SAMPSON SHORT.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS NO. 2 OF ALLEGHENY COUNTY

Argued October 30, 1889—Decided November 11, 1889.

1. Proof of part performance by the plaintiff, under a contract the existence of which is afterwards denied by the defendant, will entitle the plaintiff to recover for the part of the contract performed by him, without proof of full performance.

2. Where the plaintiff, under an alleged contract to deliver fourteen squares of lumber, delivered eleven of them, and the defendant then denied the contract, if the existence of the contract is found by the jury, the plaintiff may recover for the lumber delivered.

Charge of Court below.

Before Paxson, C. J., Sterrett, Green, Clark, Williams, McCollum and Mitchell, JJ.

No. 74 October Term 1889, Sup. Ct.; court below, No. 175 July Term 1885, C. P. No. 2.

On May 21, 1885, C. M. Stewart and Peter M. Smith, trading as Stewart & Smith, brought assumpsit against Sampson Short, to recover $2,066.30, for "balance due upon book account for boards sold and delivered by plaintiffs to defendant." The defendant pleaded non-assumpsit.

At the trial on February 15, 1889, a case was shown sufficiently appearing in the oral charge to the jury, White, J.:

The plaintiffs claim that in June, 1881, they sold a lot of lumber to the defendant; that the contract was made on Friday, June 3d, conditionally, and consummated finally on Saturday morning, June 4th. The amount of lumber was 283,000 feet, consisting of fourteen "pieces," as they are called. Each of those pieces consisted of four platforms about sixteen feet square, and each piece contained 20,000 feet of boards, except two which contained 21,000 and 22,000 feet respectively. The claim on the part of plaintiffs is that they were to deliver this lumber at Short's landing, which was some eight or nine squares below Hill's landing, on the Allegheny river, where the lumber was then moored, and that the next week Mr. Short was to settle for it at the rate of $15.50 a thousand, one half to be cash and one half payable in four months. The claim is that at the time the contract was consummated on Saturday, Mr. Short told Mr. Smith, one of the plaintiffs, to drop the lumber down to Short & McClure's landing, and that some one would be there to take care of it. In pursuance of that contract, the plaintiffs claim they delivered eleven pieces of this lumber, and that shortly after that delivery the river rose and they were all swept away, the three undelivered pieces being also swept away. Mr. Smith testifies that after the flood a few days he saw the defendant and asked him about the three pieces that had not been delivered, what should be done about them, when Mr. Short replied that he had made no contract with him, and denied that he had any contract to purchase the lumber. Mr. Smith says he notified him that he would be held to the contract, and that he would

dispose of the lumber to the best advantage he could and hold him, Short, responsible for what he might lose in consequence of the defendant not paying for the lumber according to the contract. Then Mr. Smith says he sold all of this lumber, as far as he could collect and gather it up, and that after selling and paying the necessary expenses connected with it he suffered a loss of a little over two thousand dollars. In his testimony he spoke about realizing from the whole amount some seventeen hundred and odd dollars, but the counsel for plaintiff is willing to admit that he actually realized some twenty-two or twenty-three hundred dollars, and the claim is now for a little more than two thousand dollars.

[Of course the first question is, was there a contract such as is alleged by plaintiffs, because the defence is that there was no contract whatever. On that point you have the testimony, first of Mr. Smith. He testifies positively and unqualifiedly to the contract; that after frequent conversations and negotiations between him and the defendant, on Friday evening, the 3d of June, when he had made an arrangement to sell the lumber to Mr. Sholes, Mr. Short said to him, "Why don't you sell to me?" and offered or agreed to pay a certain amount for it, $15.50 a thousand feet, and take the whole of it. Mr. Smith says he told Mr. Short he would have to see Mr. Sholes and if he would relieve him from his arrangement with him, he would let him, Short, have it at $15.50. He testifies that he saw Mr. Sholes that evening and he agreed to release him, and the next morning he saw the defendant at the Robinson House, where the contract was absolutely consummated, and that it was then that the defendant told him to drop it down to that landing, where there would be some person to furnish lines or take care of it. Corroborating in some measure, we may say, the plaintiff's testimony, is the fact that the lumber was commenced to be delivered at that landing immediately afterwards, part of it on the next day, Sunday, and the balance on Monday, excepting the three pieces.][3] But directly corroborative of the plaintiff's statement is the testimony of Mr. Chase, who said he was a lumberman and knew all of these parties, and was also selling lumber; that on Saturday morning he came to the Robinson House and met the defendant, and that in a conversation with Mr. Short he, Short, told him he had bought this lumber of Mr. Smith.

Also the testimony of Mr. Early, another lumberman engaged in selling lumber for some parties up the river. Mr. Early testifies that on that Saturday morning he also met Mr. Short in the Robinson House, and that he was also endeavoring to sell him lumber and that Mr. Short told him he had bought the lumber of Smith or Smith & Stewart, and had bought it at a half dollar less a thousand than had been asked for it; that he knew the lumber because he had seen it "rafted," and that it was better lumber than his, Early's, was; and Mr. Short admits that he did see the lumber when it was being hauled to be rafted in Jefferson county and knew exactly what kind of lumber it was. Mr. Smith testifies that defendant agreed to take the lumber at the measurement of Mr. Brooks, who had made an estimate of the amount as he was rafting it, and that Mr. Short agreed to take it at that measurement because he knew Mr. Brooks.

Now, on the part of the defendant, he denies that he made the contract; he admits having had conversations with Mr. Smith on the subject, but denies that he had made a contract, and says he told him on Friday evening, in the last interview he had with him on the subject, that he would be back next week and would then see about it; if it was not sold in the meantime, perhaps he might buy it, but he denies entirely the contract. The strongest corroboration of the defendant would be the testimony of his son, who says he was with his father all of Friday evening; that Mr. Smith did not go away that evening, but that he was in their room playing cards until very late, and that on Saturday morning his father did not see Smith, because he was with him all the time, from the time they got up until his father took the cars in Allegheny for home, and that he did not see Mr. Chase or Mr. Early, and that it was impossible for his father to have had these conversations testified to by Mr. Smith, Mr. Chase and Mr. Early; and then that at nine o'clock on Saturday morning, after his father had left, he met Mr. Smith, when Mr. Smith told him his father could have the lumber. His father had started home that morning and the son was to go also, and Mr. Smith told him when he went home to tell his father that he could have the lumber, and he was to telegraph or write him whether he would take it or not. The son says he got home late at night and did not see his father until Monday morning, when he spoke to him about

it and he said he did not want it, and the son says now that he wrote Mr. Smith to that effect; previously, it would seem, he had said he had telegraphed him. Mr. Smith denies the receipt of the letter or telegram. Then, as somewhat incompatible with the plaintiff's testimony, two or three witnesses say that Mr. Smith was playing cards that evening in the room up-stairs and could not have gone away, as he claims, to see Mr. Sholes on Friday evening, and also, I believe, something as to the conversations about buying the lumber which would be inconsistent with the idea of a contract at that time.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

You will consider all the testimony in the case and determine from it whether there was such a contract as testified to by the plaintiff. If there was not such a contract, then your verdict should be for the defendant. If there was such a contract, then you proceed further. The plaintiffs would be bound to deliver the lumber in pursuance of that contract. There was no specified time for the delivery, except it was to be delivered, the inference would be, just as soon as possible, because the defendant was to be down next week and settle for it. Mr. Smith and Mr. Chase testified that on Sunday they delivered four pieces, which would be about 80,000 feet, and seven pieces more on Monday, which would be eleven pieces in all, or about 220,000 feet, and Mr. Rupp and Mr. McClure admit that there were eleven pieces swept away by the flood.

The defendant requests the court to charge [inter alia]:

2. That the testimony shows that plaintiffs did not deliver the raft of lumber which they allege that they agreed to sell and deliver to the defendant, and that the terms of the alleged contract of sale had not been performed by plaintiffs, at the time when the pieces of the raft were carried away by an extraordinary flood in the Allegheny river; therefore plaintiffs cannot recover.

Answer: If the plaintiffs delivered eleven pieces in pursuance of their contract with defendant, and then defendant denied he had any contract with plaintiffs, that would excuse plaintiffs from delivering the other three pieces, and plaintiffs could recover for what they had delivered.[1]

3. Even if the allegation of the plaintiffs as to the alleged contract of sale is true, they cannot recover for that portion of

the raft moored at Short & McClure's landing on Sunday, and not accepted or taken in charge by Sampson Short or some one acting for him.

Answer: Refused, if the four pieces delivered on Sunday, were delivered and moored properly and remained there with the remaining pieces delivered on Monday, when the flood occurred some days later.[2]

The jury returned a verdict in favor of the plaintiffs for $2,892.82. Judgment having been entered, the defendant took this appeal, assigning for error:

1, 2. The answers to defendant's points.[1] [2]

3. The portion of the charge embraced in [ ][3]

*Mr. A. M. Brown* (with him *Mr. J. S. Lambie, Mr. A. B. Force* and *Mr. Yard*), for the appellant.

That an executory contract of sale without delivery does not pass title, counsel cited: Houser v. Kemp, 3 Pa. 208; Lester v. McDowell, 18 Pa. 91; Winslow v. Leonard, 24 Pa. 14; Sneathen v. Grubbs, 88 Pa. 147; Rochester etc. Oil Co. v. Hughey, 56 Pa. 322; Story on Sales, §§ 296, 299.

*Mr. J. W. Lee* and *Mr. James F. Robb*, for the appellant, were not heard.

The brief filed cited: Moorhead v. Fry, 24 Pa. 37; Noble v. James, 2 Gr. 285; Campbell v. Gates, 10 Pa. 483.

PER CURIAM:

If the plaintiffs' account of this transaction was true, and the jury have found that it was, they were entitled to recover for the lumber delivered at defendant's landing. It is true, the contract was for the entire raft, and that a portion of it was not delivered. The raft contained 283,000 feet of boards, consisting of 14 squares or pieces. Eleven of these pieces were delivered; three of them were not delivered with the others, and defendant subsequently repudiated the contract, and declined to receive them. This clearly excused the plaintiffs from making a further delivery, and entitled them to recover for the portion which they had delivered. It is at least probable that there would not have been any trouble about

this matter but for the fact that the whole of the lumber was swept away by a flood within a day or two after the delivery at defendant's landing. The case was one for a jury. It was a question of fact, and, while there was a conflict of testimony, it is not our province to say the jury erred. We are satisfied the court did not do so. On the contrary, the case went to the jury under clear and adequate instructions from the learned judge below.

                                                        Affirmed.